[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14027-P
_____

KEITH THARPE,

Petitioner – Appellant,

versus

WARDEN,

Respondent – Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

Before:  TJOFLAT, MARCUS, and WILSON, Circuit Judges.

BY THE COURT:

This facts and procedural history of this case have been exhaustively

described in numerous opinions and orders.  *See, e.g., Tharpe v. Sellers*, 583 U.S.

___, 138 S. Ct. 545 (2018); *Tharpe v. Warden*, 834 F.3d 1323 (11th Cir. 2016);

*Tharpe v. State*, 416 S.E.2d 78 (Ga. 1992).  We write only to decide whether our

April 3, 2018 Order denying a certificate of appealability ("COA") should be reconsidered. We conclude that it should not.

We have been made aware that Keith Tharpe exhausted his juror racial bias claim in Georgia state courts. *See Tharpe v. Sellers*, No. S18W0242 (Ga. Nov. 2, 2017); *Tharpe v. Sellers*, No. S18W0242 (Ga. Sept. 26, 2017). But he is not entitled to a COA for two distinct reasons. First, his claim arises from the rule announced in *Pena-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855 (2017), and that rule does not apply retroactively. Second, he has failed to show cause to overcome his procedural default. For these two independent reasons—either of which, standing alone, would suffice to deny a COA—our decision denying his motion for COA is not due for reconsideration.

## I.

Federal habeas corpus review "serves to ensure that state convictions comport with the federal law that was established at the time petitioner's conviction became final." *Sawyer v. Smith*, 497 U.S. 227, 239, 110 S. Ct. 2822, 2830 (1990). "[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310, 109 S. Ct. 1060, 1075 (1989). "To apply *Teague*, a federal court engages in a three-step process." *Lambrix v. Singletary*, 520 U.S. 518, 527, 117 S. Ct. 1517, 1524 (1997).

2

*Teague*'s three steps, as instructed by the Supreme Court, are as follows. First, the court must determine the date on which the defendant's conviction became final. *Id.* Second, the court "must survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by *existing precedent* to conclude that the rule he seeks was required by the Constitution." *Id.* (quotations and citations omitted) (emphasis added). If the legal rule forming the basis of the claim "was not *dictated by precedent* existing at the time the defendant's conviction became final," *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S. Ct. 1173, 1181 (2007) (quotation omitted) (emphasis added), or if it would not have been "apparent to all reasonable jurists" at that time, *Chaidez v. United States*, 568 U.S. 342, 347, 133 S. Ct. 1103, 1107 (2013) (quotation omitted), then *Teague* precludes application of that rule on collateral review, absent an exception.

The third step of *Teague*'s analysis, though, is to determine if such an exception applies. Only two possible exceptions exist: (1) for new substantive rules that place "certain kinds of primary, private individual conduct beyond the power" of criminal law, or (2) for new "watershed rules of criminal procedure." *Teague*, 489 U.S. at 311, 109 S. Ct. at 1075–76 (quotation omitted).

Working our way through *Teague*, Tharpe's conviction became final on October 19, 1992, the date on which the Supreme Court denied certiorari. *See*

3

*Bond v. Moore*, 309 F.3d 770, 773 (11th Cir. 2002).  It is immediately apparent that a claim grounded in *Pena-Rodriguez v. Colorado*, a decision handed down nearly twenty-five years later on March 6, 2017, will likely fail to clear *Teague*'s hurdles.  Indeed, *Pena-Rodriguez* cannot apply to Tharpe's habeas claim because, before *Pena-Rodriguez*, no precedent established that proof of a juror's racial animus created a Sixth Amendment exception to the no-impeachment rule.

If anything, clearly-established precedent held just the opposite.  In *Tanner v. United States*, the Supreme Court explained that "[b]y the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict."  483 U.S. 107, 117, 107 S. Ct. 2739, 2745 (1987).  And, as the Supreme Court noted in *Pena-Rodriguez*, "[a]t common law[,] jurors were forbidden to impeach their verdict, either by affidavit or live testimony."  137 S. Ct. at 863 (citing *Vaise v. Delaval*, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785)).

The Supreme Court endorsed the no-impeachment rule's breadth in *McDonald v. Pless*, when it noted that "a change in the [no-impeachment] rule would open the door to the most pernicious arts and tampering with jurors[,] . . . would be replete with dangerous consequences[,] . . . and no verdict would be safe."  238 U.S. 264, 268, 35 S. Ct. 783, 784–85 (1915) (quotations omitted).

Congress likewise embraced the no-impeachment rule by incorporating it into Federal Rule of Evidence 606(b)(1), which reads this way:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

*See Pena-Rodriguez*, 137 S. Ct. at 864.

Before *Pena-Rodriguez*, the Supreme Court twice addressed whether the no-impeachment rule contained a constitutional exception.  *Id.* at 866–67 (citing *Tanner*, 483 U.S. at 125, 107 S. Ct. at 2750; *Warger v. Shauers*, 574 U.S. ___, 135 S. Ct. 521, 529 (2014)).  Each time, the Supreme Court concluded it did not.  *Id.* For that reason, *Pena-Rodriguez* was a "startling development" because "for the first time, the Court create[d] a constitutional exception to no-impeachment rules." *Id.* at 875, 879 (Alito, J., dissenting).

Since *Pena-Rodriguez* established a new rule that was neither "dictated" nor "apparent to all reasonable jurists" at the time of Tharpe's conviction, we must determine whether it fits within one of *Teague*'s two retroactivity exceptions.  We conclude it does not.  First, the rule announced in *Pena-Rodriguez* is not a substantive one because it neither "decriminalizes a class of conduct nor prohibits the imposition of capital punishment on a particular class of persons." *Lambrix*, 520 U.S. at 539, 117 S. Ct. at 1531 (quotation omitted).  Tharpe nonetheless cited

5

*Bradford v. Bruno's, Inc.*, 94 F.3d 621, 622 (11th Cir. 1996), and *Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000), for the proposition that *Pena-Rodriguez* decreed a substantive rule. Yet those cases had nothing to do with either the no-impeachment rule or *Teague* retroactivity. Rather, they addressed whether wholly different state rules of evidence were substantive for purposes of the *Erie* doctrine.[1] *Bradford*, 94 F.3d at 622; *Ungerleider*, 214 F.3d at 1282.

Because the inquiry into whether a rule is substantive under *Teague* is utterly distinct from whether it is substantive under *Erie*, no reasonable jurist could accept Tharpe's argument. Rather, the rule in *Pena-Rodriguez* is plainly procedural in nature; it regulates only the manner of determining the defendant's culpability and concerns a procedural mechanism by which to challenge a jury verdict. It does not satisfy *Teague*'s first exception for retroactivity.

Additionally, the *Pena-Rodriguez* rule is not a watershed rule of criminal procedure that would satisfy *Teague*'s second exception. This exception "is extremely narrow, and it is unlikely" that any class of rules satisfying it has "yet to emerge" since *Teague*. *Schriro v. Summerlin*, 542 U.S. 348, 352, 124 S. Ct. 2519, 2523 (2004) (quotation omitted). "[T]he paradigmatic example of a watershed rule of criminal procedure is the requirement that counsel be provided in all criminal trials for serious offenses." *Gray v. Netherland*, 518 U.S. 152, 170, 116 S. Ct.

---

[1] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938).

6

2074, 2085 (1996) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963)).  "[R]ules that regulate only the *manner of determining* the defendant's culpability are procedural," and thus apply retroactively to collateral proceedings only if they are exceedingly rare "watershed[s]" akin to *Gideon*.  *Schriro*, 542 U.S. at 353, 124 S. Ct. at 2523.  In light of this exceedingly high bar, even Tharpe himself does not argue that *Pena-Rodriguez*'s rule is such a watershed.

Because a state court in October 1992 would not have felt that the rule announced in *Pena-Rodriguez* was required by then-existing precedent, and because the *Pena-Rodriguez* rule is neither a new substantive rule that places primary conduct beyond the power of criminal law nor a watershed rule of criminal procedure, *Teague* bars Tharpe's claim.  *See Tharpe*, 138 S. Ct. at 551 (Thomas, J., dissenting) ("[N]o reasonable jurist could argue that *Pena-Rodriguez* applies retroactively on collateral review.").  This alone would be enough reason to deny Tharpe's motion for a COA and accordingly his motion for reconsideration.  However, there exists a second, independent reason: Tharpe failed to show cause for his procedural default.

## II.

The procedural default rule is clear.  It provides that "[f]ederal courts may not review a claim procedurally defaulted under state law if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural

7

bar, and the bar presents an independent and adequate state ground for denying relief." *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996). A federal court cannot review a procedurally defaulted claim unless the petitioner can show cause for the failure to properly present the claim and actual prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506–07 (1977). "To establish 'cause' for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). "[A]llegations [supporting cause and prejudice] must be factual and specific, not conclusory." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 691 (11th Cir. 2017) (quoting *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)).

The Georgia courts have unambiguously held that Tharpe's juror racial bias claim was procedurally defaulted. The Superior Court of Butts County ruled that "even if [Tharpe] had admissible evidence to support his claim of juror misconduct, this Court finds that the claims are procedurally defaulted as [Tharpe] failed to raise them at the motion for new trial or on appeal." *Tharpe v. Hall*, No. 93-V-144, at 102 (Ga. Super. Ct. Dec. 1, 2008). After Tharpe returned to state court following *Pena-Rodriguez*, the Superior Court again held that Tharpe's claim "is still procedurally defaulted." Pet'r's Mot. for Recons. Ex. A at 4. Again, the

8

Supreme Court of Georgia refused to review the claim.  *Id.* Ex. B.  Since Tharpe's

juror racial bias claim was procedurally defaulted, and since the Supreme Court of

the United States held that Barney Gattie's affidavit would permit jurists of reason

to dispute whether Tharpe demonstrated prejudice, *see Tharpe*, 138 S. Ct. at 546,

the only question is whether Tharpe arguably proved cause.

To prove cause, Tharpe alleged only, and at the highest order of abstraction,

that "trial counsel [was] ineffective in failing to raise meritorious claims on appeal,

and that trial counsel's ineffectiveness constitutes cause to excuse any procedural

default."  He alleged no specific facts.  Indeed, he alleged nothing at all.  The state

court rejected the argument as a bare, conclusory assertion.  The District Court

agreed, noting "[p]etitioner, unfortunately, fails to provide any details regarding

[the] allegation . . . that his trial and appellate attorneys were ineffective[, thereby

establishing] cause to overcome [his] defaults."  *Tharpe v. Humphrey*, No. 5:10-

CV-433, at 9 (M.D. Ga. Aug. 18, 2011).  Because Tharpe's attempt to show cause

is wholly unsubstantiated, he has failed to make the requisite showing of cause to

overcome his procedural default.  *See Tharpe*, 138 S. Ct. at 552 (Thomas, J.,

dissenting) ("[N]o reasonable jurist could argue that Tharpe demonstrated cause

for his procedural default.").

9

\*        \*        \*

For the foregoing reasons, we deny Keith Tharpe's motion for

reconsideration of the April 3, 2018 Order denying a COA.

**MOTION FOR RECONSIDERATION DENIED.**

WILSON, Circuit Judge, specially concurring:

I am persuaded that Mr. Tharpe's application for a COA should be denied because *Peña-Rodriguez*[1] does not apply retroactively under the *Teague*[2] analysis.

After working through the first two steps of *Teague*'s framework, it is clear that Tharpe cannot show that existing precedent dictated Peña-Rodriguez. Thus, Tharpe's only other available option is to claim that *Peña-Rodriguez* meets one of the two exceptions to Teague's bar—the second exception, declaring that it is a new watershed rule of criminal procedure, being the most plausible. This exception, though, is extremely narrow and has not been used to this day. *See Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (The exception is reserved for "only a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. . . . [A] new procedural rule [being] fundamental in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is *seriously* diminished. . . . [However] [t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." (internal citations and quotation marks omitted)). Again, this avenue is so rare that, as the Order points out, even Tharpe himself has not made this argument.

---

[1] *Peña-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855 (2017).

[2] *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989).

In addition, I disapprove of the lackadaisical treatment of Mr. Gattie's original affidavit. The statements and beliefs contained in the affidavit were not "offhand comments" by any means. *See Tharpe v. Warden*, No. 17-14027-P, slip op. at 5–7 (11th Cir. Sep. 21, 2017) (laying out the district court's reasoning regarding Mr. Gattie's affidavit which was easily disavowed by the Supreme Court in *Tharpe v. Sellers*, 583 U.S. ___, ___, 138 S. Ct. 545, 545–46 (2018)). To the contrary, Gattie's repugnant comments were rife with racial slurs; deeply seeded views regarding integration, interracial marriage, and the like; a comment inquiring whether black people even had souls; and even an explicit statement that the juror's decision to sentence Tharpe to death was at least, in part, based on race.[3]

_____

[3] The juror in question, Juror Gattie, said the following in his affidavit:

> I . . . knew the girl who was killed, Mrs. Freeman. Her husband and his family have lived in Jones [C]ounty a long time. The Freemans are what I would call a nice Black family. In my experience I have observed that there are two types of black people. 1. Black folks and 2. Niggers. For example, some of them who hang around our little store act up and carry on. I tell them, "nigger, you better straighten up or get out of here fast." My wife tells me I am going to be shot by one of them one day if I don't quit saying that. I am an upfront, plainspoken man, though. Like I said, the Freemans were nice black folks. If they had been the type Tharpe is, then picking between life or death for Tharpe wouldn't have mattered so much. My feeling is, what would be the difference. As it was, because I knew the victim and her husband's family and knew them all to be good black folks, I felt Tharpe, who wasn't in the "good" black folks category in my book, should get the electric chair for what he did. Some of the jurors voted for death because they felt that Tharpe should be an example to other blacks who kill blacks, but that wasn't my reason. The others wanted blacks to know they weren't going to get away with killing

12

Over the long course of this procedurally complex case, it is easy to gloss over our improper treatment of Mr. Gattie's original affidavit, but it is something that I want to acknowledge. Absent intervention from the Supreme Court, it seems that we would have approved of the idea that Mr. Gattie's affidavit would not have amounted to prejudice. I do not stand by that idea, or our court's treatment of the affidavit. As a factual matter, the statements contained therein clearly indicate a reliance on racial animus to convict or sentence a defendant.

---

each other. After studying the Bible, I have wondered if black people even have souls. Integration started in Genesis. I think they were wrong. For example, look at O.J. Simpson. That white woman wouldn't have been killed if she hadn't have married that black man.